**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **LATRIS JOLLA, CARLIYAH BRACKEN, STEVEN RHODES ON BEHALF OF HIMSELF AND HIS MINOR CHILDREN, and KAELYN FRANKLIN ON BEHALF OF HERSELF AND HER MINOR CHILDREN,** <br><br> **individually and on behalf of all others similarly situated**, <br><br>    **Plaintiffs,** <br><br> **v.** <br><br> **ACADIA HEALTH, LLC d/b/a JUST KIDS DENTAL,** <br><br>   **Defendant.** | **Case No. 3:23-cv-01370-SDD-EWD** |

**SECOND AMENDED CLASS ACTION PETITION**
**FOR DAMAGES AND INJUNCTIVE RELIEF**

1.     Plaintiffs Latris Jolla, Carliyah Bracken, Steven Rhodes on behalf of himself and his minor children, and Kaelyn Franklin on behalf of herself and her minor children ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Acadia Health, LLC d/b/a Just Kids Dental ("JKD" or "Defendant") to obtain damages, restitution, and injunctive relief from Defendant. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and facts that are a matter of public record.

**NATURE OF THE ACTION**

2.     This class action arises out of Defendant JKD failures to properly secure, safeguard, encrypt, and/or timely and adequately destroy Plaintiffs' and Class Members' sensitive personal identifiable information that it had acquired and stored for its business purposes. This failure to

secure and monitor its network resulted in an August 2023 data breach ("Data Breach") of highly sensitive documents and information stored on the computer network of Just Kids Dental, an organization that provides medical treatment and/or employment to individuals, including Plaintiffs and Class Members.

3.    Defendant's data security failures allowed a targeted cyberattack in or about August 2023 to compromise Defendant's network (the "Data Breach") that contained personally identifiable information ("PII") and protected health information ("PHI") (collectively, "the Private Information") of Plaintiffs and other individuals ("the Class").

4.    According to a notice JKD sent to State Attorney Generals, the breach has affected "129,623 individuals."[1]

5.    According to a notice on its website, Defendant confirmed that a "cyber event" occurred on its network on August 2, 2023.

6.    Defendant's website notice also states: "On the evening of August 7th, 2023, a program was used to encrypt JKD's computer networks and data, including systems that Just Kids Dental uses to store certain patient and employee files. This incident was discovered on the morning of August 8, 2023."[2]

7.    Despite learning of the Data Breach on or about August 8, 2023, and determining that Private Information was involved in the breach on August 2, 2023, Defendant did not begin sending notices of the Data Breach (the "Notice of Data Breach Letter") until on or about September 13, 2023.

---

[1] https://apps.web.maine.gov/online/aeviewer/ME/40/3b1d6421-e4c2-456f-b46e-e9689b9aa953.shtml (accessed December 12, 2023).
[2] https://www.justkids-dental.com/breach/ (last accessed December 12, 2023).

8.     The Private Information compromised in the Data Breach included certain personal or protected health information of current and former employees and patients, including Plaintiffs. This Private Information included, but is not limited to: names, addresses, emails, phone numbers, birth dates, Social Security numbers, driver's license numbers, health insurance policy information, treatment information including radiographic images, medical record numbers, account numbers, and health conditions.[3]

9.     The Private Information was compromised in what JKD refers to as a "cybersecurity incident" in which its "computer systems and network were attacked by a malicious actor."[4] In other words, the cybercriminals intentionally targeted JKD for the highly sensitive Private Information it stores on its computer network, attacked the insufficiently secured network, then exfiltrated highly sensitive PII and PHI, including but not limited to Social Security numbers. As a result, the Private Information of Plaintiffs and Class remains in the hands of those cyber-criminals.

10.     The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which it was entrusted for either treatment or employment or both.

11.     Plaintiffs bring this class action lawsuit on behalf of themselves and all others similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information had been subject to the unauthorized access of an unknown third party and including in that notice precisely what specific types of information were accessed and taken by cybercriminals.

---

[3] *Id.* (last accessed December 12, 2023).
[4] *See* Exemplar Notice Letter, attached as Exhibit A.

12.     Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant JKD's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

13.     Defendant disregarded the rights of Plaintiffs and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiffs' and Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members with prompt and full notice of the Data Breach.

14.     In addition, Defendant JKD failed to properly monitor the computer network and systems that housed the Private Information. Had JKD properly monitored its property, it would have discovered the intrusion sooner rather than allowing cybercriminals almost a month of unimpeded access to the PII and PHI of Plaintiffs and Class Members.

15.     Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant JKD collected and maintained is now in the hands of data thieves.

16.     Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain

government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

17.     As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and for years into the future closely monitor their financial accounts to guard against identity theft.

18.     Plaintiffs and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

19.     Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach (the "Class").

20.     Accordingly, Plaintiffs brings this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) negligence *per se*, (iii) breach of implied contract, (iv) breach of fiduciary duty; and (v) unjust enrichment, and (vi) declaratory relief.

21.     Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant, and declaratory relief.

## PARTIES

22.     Plaintiff Latris Jolla is and at all times mentioned herein was an individual citizen of the State of Louisiana, residing in the city of Baton Rouge in the Parish of East Baton Rouge, and is the parent of a now-adult patient of JKD, Carliyah Bracken. Plaintiff Jolla received notice of the Data Breach dated September 13, 2023.

23.     Plaintiff Carliyah Bracken is and at all times mentioned herein was an individual citizen of the State of Louisiana, residing in the city of Baton Rouge in the Parish of East Baton Rouge, and is the child of Latris Jolla who received a Data Breach notice regarding her PII/PHI dated September 13, 2023.

24.     Plaintiff Steven Rhodes is and at all times mentioned herein was an individual citizen of the State of Louisiana, residing in the city of Baton Rouge in the Parish of East Baton Rouge, and is the parent of several minor children who are or were patients of JKD. Plaintiff Rhodes received notices of the Data Breach dated September 13, 2023.

25.     Plaintiff Kaelyn Franklin is and at all times mentioned herein was an individual citizen of the State of Louisiana, residing in the city of Baton Rouge in the Parish of East Baton Rouge, and of several minor children who are or were patients of JKD. Plaintiff Franklin received notice of the Data Breach dated September 13, 2023.

26.     Defendant Acadia Health LLC, d/b/a Just Kids Dental is a limited liability company, domiciled and registered under the laws of Delaware. Its registered office in Louisiana is located at 3867 Plaza Tower Dr., 1st Floor, Baton Rouge, Louisiana 70816, and its principal business office is located at 3502 S Carrollton Avenue, New Orleans, Louisiana 70118.

27.     Just Kids Dental can be served through its registered agent Registered Agent Solutions at 3867 Plaza Tower, 1st Floor, Baton Rouge, Louisiana 70816.

28.     Manager/Officer of the LLC, Chandler Dollins, maintains an office at 7150 Cahaba Valley Rd., Suite 101, Birmingham, Alabama 35242. On its Notice Letters, Chandler Dollins is self-described as "Director of Technology" and utilizing the Birmingham, Alabama address. The citizenship of Manager/Officer Dollins is in the State of Alabama.

29.     In its required notices to the State Attorneys General, Defendant JKD states that at least one Maine resident was affected by this Data Breach (*see* https://apps.web.maine.gov/online/aeviewer/ME/40/3b1d6421-e4c2-456f-b46e-e9689b9aa953.shtml), and that at least one Massachusetts resident was affected by this Data Breach (*see* https://www.mass.gov/doc/data-breach-report-2023/download). For purposes of diversity jurisdiction, it is alleged that these putative class members are citizens of Maine and Massachusetts, respectively. In addition, as alleged above, at least one member of JKD's LLC (Manager/Officer of the LLC, Chandler Dollins) is, upon information and belief, a citizen of Alabama.

## JURISDICTION AND VENUE

30.     Defendant Acadia Health LLC, d/b/a Just Kids Dental's citizenship is determined by the citizenship of all of its members, which includes, *inter alia*, the only publicly available known member, Chandler Dollins, who is a citizen of Alabama. *See Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008) ("[T]he citizenship of an LLC is determined by the citizenship of all of its members.").

31.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs. In addition, this Court subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because there are more than 100 members

in the proposed class, and at least one member of the class is a citizen of a state different from Defendant. *See* https://apps.web.maine.gov/online/aeviewer/ME/40/3b1d6421-e4c2-456f-b46e-e9689b9aa953.shtml (Defendant JKD lists the total number of affected personas as 129,623, with one being a resident of Maine). No publicly available information suggests that any member of Acadia Health LLC is a citizen of Maine. In addition, at least one Massachusetts resident was affected by this Data Breach (see https://www.mass.gov/doc/data-breach-report-2023/download). For purposes of diversity jurisdiction, it is alleged that these putative class members are citizens of Maine and Massachusetts, respectively.

32.     The Court has general personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business or business venture in Louisiana. It is registered with the Secretary of State in Louisiana as a non-Louisiana limited liability company (Delaware) that maintains its principal business office and principal business establishment in Louisiana; and committed tortious acts in Louisiana.

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the district within which JKD maintains a primary place of business; it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred; and it is the district where JKD has the most significant contacts.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

34.     Defendant Acadia Health, LLC d/b/a Just Kids Dental "provides affordable and quality dental health care to all children ages birth-21, through the collaboration of General Dentist, Pediatric Dentist, and Endodontic Specialist."[5]

---

[5] https://www.justkids-dental.com/ (last accessed December 13, 2023).

35.     JKD was founded in 2009, JKD has three locations and serves more than 100,000 patients. JKD employs more than 25 people and generates approximately $373,000 in annual revenue. [6]

36.     JKD claims, it "exists for the purpose of providing quality dental care for our patients in a safe and caring environment, improving their overall medical condition resulting in a higher quality of life."[7]

37.     The JKD system includes locations in New Orleans, Kenner, and Baton Rouge. For the purposes of this Class Action Complaint, all of JKD's associated locations will be referred to collectively as "JKD."

38.     In the ordinary course of receiving medical care services from Defendant JKD, or alternatively being employed by JKD, each patient and employee must provide (and Plaintiffs did provide) Defendant JKD with sensitive, personal, and private information, such as their:

- Name, address, phone number, and email address;

- Date of birth;

- Social Security number;

- Marital status;

- Employer with contact information;

- Primary and secondary insurance policy holders' name, address, date of birth, and Social Security number;

- Demographic information;

- Driver's license or state or federal identification;

---

[6] *Id.*
[7] https://www.justkids-dental.com/about-us/ (last accessed December 13, 2023).

- Information relating to the individual's medical and medical history;

- Insurance information and coverage; and

- Banking and/or credit card information.

39.     Defendant also creates and stores medical records and other protected health information for its patients, records of treatments and diagnoses.

40.     Thus, due to the highly sensitive and personal nature of the information JKD acquires and stores with respect to its patients, JKD, upon information and belief, promises to, among other things: keep patients' Private Information private; comply with industry standards related to data security and the maintenance of its patients' Private Information; inform its patients of its legal duties relating to data security and comply with all federal and state laws protecting patients' Private Information; only use and release patients' Private Information for reasons that relate to the services it provides; and provide adequate notice to patients if their Private Information is disclosed without authorization.

41.     Upon information and belief, JKD's HIPAA Notice of Privacy Practices ("Privacy Policy") is provided to every patient both prior to receiving treatment and upon request.[8] JKD's Privacy Notice makes clear that it understands that its patients' Private Information is personal and must be protected by law.

42.     Defendant JKD agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiffs and Class Members safely, confidentially, and in compliance with all applicable laws, including the Federal Trade

---

[8] https://justkids-dental.com/wp-content/uploads/2012/11/Revised-Privacy-Practices-English.pdf; https://justkids-dental.com/wp-content/uploads/2012/11/HIPAA-Consent-English.pdf (last accessed December 13, 2023).

Commission Act ("FTCA"), 15 U.S.C. § 45, and the Health Insurance Portability and Accountability Act ("HIPAA").

43.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, JKD assumed legal and equitable duties it owed to them and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure and exfiltration.

44.     Yet, through its failure to properly secure the Private Information of Plaintiffs and Class, JKD failed to meet its own promises of patient privacy.

45.     The patient information held by Defendant JKD in its computer system and network included the highly sensitive Private Information of Plaintiffs and Class Members.

### *The Data Breach*

46.     A data breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by a business entity like JKD.

47.     According to Defendant's website Notice, it learned of a cyberattack on its computer systems on or around August 8, 2023, when it took many of the healthcare provider's networked systems offline, adversely affecting patient treatment, scheduling, and the ability to access patient histories.[9]

48.     Upon information and belief, Defendant belatedly notified HHS of the Data Breach.[10]

49.     Since the Data Breach, according to Defendant's website notice, at least one ransomware group claimed responsibility for the attack and JKD "negotiated" with them. JKD

---

[9] https://www.justkids-dental.com/breach/ (last accessed December 13, 2023).
[10] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed December 13, 2023).

relies on the "word" of cybercriminals to trust they have not misused the data they stole. The website notice explains:

### What Happened

On August 2, 2023 Acadia Health, LLC's ("Just Kids Dental" or "JKD") computer systems and network were attacked by a malicious actor. On the evening of August 7th, 2023, a program was used to encrypt JKD's computer networks and data, including systems that Just Kids Dental uses to store certain patient and employee files. This incident was discovered on the morning of August 8, 2023.

### What Information Was Involved

The information stored on the impacted servers related to you will depend on your relationship to Just Kids Dental:

For patients, the affected personal information may have included your name, address, email, phone number(s), birth date, Social Security number, driver's license number, health insurance policy information, treatment information including radiographic images, medical record number, account number, and health conditions.

For patient parents or guardians, the affected personal information may have included your name, address, email, phone number(s), birth date, Social Security number, driver's license number, and health insurance policy information.

For current and former employees, the affected personal information may have included your name, Social Security number, local state and federal licensing information (NPI, DEA, and State licensing numbers).

At the time of the breach, less than 11% of our unique patient records included a Social Security Number.

Just Kids Dental does not hold any patient financial information with the exclusion of patient service charges rendered. No patient banking or credit card account information was obtained in this breach.

Just Kids Dental is not presently aware of any misuse of your information. We have negotiated with the malicious actor, and they have agreed to delete any data retained and confirmed the data has not been sold or distributed. At this time, we have no reason to believe any misuse of this data will come to our patients, parents, or employees. However, this notice is an abundance of caution so you can take the steps you feel necessary to protect your information; We strongly believe that every persons effected [*sic*] should remain vigilant in monitoring their credit report due to the number of recent cyber breaches.[11]

---

[11] https://www.justkids-dental.com/breach/ (last accessed December 12, 2023).

50.     In January 2023, HHS created a presentation specifically for healthcare providers and IT departments, warning entities like JKD of the severe threats posed by Royal, BlackCat and similar cybercriminal groups.[12] Within the healthcare industry, the risk of a cyberattack is well-known and preventable with adequate security systems in place.

51.     On or about September 13, 2023, a little over a month after JKD learned that the Class's Private Information was attacked by cybercriminals, JKD patients began receiving their notices of the Data Breach informing them that its investigation determined that their Private Information was accessed.

52.     JKD's notice letters list time-consuming, generic steps that victims of data security incidents can take, such as getting a copy of a credit report or notifying law enforcement about suspicious financial account activity. JKD did not even offer any complimentary credit monitoring or identity theft services to help victims "remain vigilant against incidents of identity theft and fraud"[13] JKD offered no other substantive steps to help victims like Plaintiffs and Class Members to protect themselves. On information and belief, JKD sent a similar generic letter to all other individuals affected by the Data Breach.

53.     JKD's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

54.     JKD knew or should have known that its electronic records would be targeted by cybercriminals.

---

[12] https://www.hhs.gov/sites/default/files/royal-blackcat-ransomware-tlpclear.pdf (last accessed December 13, 2023).
[13] https://www.justkids-dental.com/breach/

55.    JKD had obligations created by HIPAA, FTCA, contract, industry standards, common law, and representations made to Plaintiffs and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

56.    Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

### The Data Breach was a
### Foreseeable Risk of which Defendant was on Notice.

57.    It is well known that PII, including Social Security numbers in particular, is a valuable commodity and a frequent, intentional target of cyber criminals. Companies that collect such information, including JKD, are well-aware of the risk of being targeted by cybercriminals.

58.    Individuals place a high value not only on their PII, but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

59.    A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are

not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[14]

60.     Individuals, like Plaintiffs and Class members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing your DNA for hacker's purposes.

61.     Data Breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiffs and Class Members cannot obtain new numbers unless they become a victim of Social Security number misuse.

62.     The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[15]

63.     In 2021, there were a record 1,862 data breaches, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[16]

64.     Additionally in 2021, there was a 15.1% increase in cyberattacks and data breaches since 2020. Over the next two years, in a poll done on security executives, they have predicted an

---

[14] "Victims of Identity Theft, 2018," U.S. Department of Justice (April 2021, NCJ 256085) available at: https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed December 13, 2023).
[15] https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed December 13, 2023).
[16] https://www.cnet.com/tech/services-and-software/record-number-of-data-breaches-reported-in-2021-new-report-says/ (last accessed December 13, 2023).

increase in attacks from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[17]

65.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

66.    According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data." [18] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[19]

67.    Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, JKD failed to take appropriate steps to protect the PII of Plaintiffs and the proposed Class from being compromised.

***Data Breaches are Rampant in Healthcare.***

68.    Defendant's data security obligations were particularly important given the substantial increase in data breaches in the healthcare industry preceding the date of the breach.

---

[17] https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last accessed December 13, 2023).
[18] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last accessed December 13, 2023).
[19] *Id.*

69.     According to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights] OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[20]

70.     Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[21]

71.     The HIPAA Journal article goes on to explain that patient records, like those stolen from JKD, are "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[22]

72.     Data breaches such as the one experienced by Defendant JKD have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, can prepare for, and hopefully can ward off a potential attack.

---

[20] https://www.hipaajournal.com/why-do-criminals-target-medical-records/ (last accessed December 13, 2023).
[21] *Id.*
[22] *Id.*

73.    In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[23]

74.    HHS data shows more than 39 million patients' information was exposed in the first half of 2023 in nearly 300 incidents and that healthcare beaches have doubled between 2020 and 2023, according to records compiled from HHS data by Health IT Security.[24]

75.    According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical record for up to $1,000."[25]

76.    The significant increase in attacks in the healthcare industry, and attendant risk of future attacks, is widely known to the public and to anyone in that industry, including Defendant JKD.

### *Defendant Fails to Protect Children's Private Information*

77.    According to a 2021 study by Javelin Research and Strategy, child identity fraud affects one out of every 500 children annually, costs U.S. families nearly $1 billion annually, and takes parents and guardians far longer to resolve than adult identity fraud.[26]

78.    According to this research, "One of the most daunting challenges, as it relates to detecting the theft or compromise of a child's identity, is that fraud typically takes place years after a child's personally identifiable information (PII) is initially breached." Because children are not

---

[23] *See* Maria Henriquez, Iowa City Hospital Suffers Phishing Attack, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last accessed December 13, 2023).
[24] https://healthitsecurity.com/features/biggest-healthcare-data-breaches-reported-this-year-so-far (last accessed December 13, 2023).
[25] https://www.ahu.edu/blog/data-security-in-healthcare (last accessed December 13, 2023).
[26] https://www.javelinstrategy.com/research/child-identity-fraud-web-deception-and-loss (last accessed December 13, 2022).

filing taxes, applying for loans, and opening bank accounts, misuse of their Private Information is less often flagged early, and therefore can abused for much longer before detected.[27]

79.    A child's "blank slate" provides cyber criminals the opportunity to create a "synthetic" identity using both real and fictitious information to seek loans since a child's Social Security number completely lacks a credit history.[28]

80.    According to the FTC, cybercriminals armed with children's Social Security numbers, name, address, and date of birth are able to:  apply for government benefits, like health care coverage or nutrition assistance; open a bank or credit card account; apply for a loan; sign up for a utility service, like water or electricity; or rent a place to live.[29]

81.    Although checking a child's credit report is a step that concerned parents should take, it is more difficult that checking an adult's credit report. A child's credit check may require requesting that each of the three reporting agencies perform a manual search and may require providing additional documentation, including but not limited to: the parent or legal guardian's driver's license or government-issued identification card; proof of the parent or legal guardian's address, (a utility bill, or a credit card or insurance statement); the child's birth certificate; and the child's Social Security card.[30] Each of these requirements can present hurdles—and are time-consuming—for parents who receive notice of a data breach affecting a child. And for families with multiple children, like those of the Plaintiffs, the hurdles rise exponentially.

---

[27] *Id.*
[28] *What is Child Identity Theft?,*  Identity Theft Resource Center, https://www.idtheftcenter.org/help_center/what-you-need-to-know-about-child-identity-theft/ (last accessed December 13, 2022).
[29] https://consumer.ftc.gov/articles/how-protect-your-child-identity-theft (last accessed December 13, 2022).
[30] *Id.*

82.     Data breaches of a hospital handling children's data, like Defendant, result in widespread and extremely long-term problems for their patient families, who may be reeling from the impact for years if not decades.

### Defendant Fails to Comply with FTC Guidelines.

83.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

84.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[31] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[32]

85.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity

---

[31] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed December 13, 2023).

[32] *Id.*

on the network; and verify that third-party service providers have implemented reasonable security measures.

86.     The FTC has brought enforcement actions against businesses, like that of JKD, for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

87.     These FTC enforcement actions include actions against healthcare providers like Defendant. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

88.     Defendant failed to properly implement basic data security practices.

89.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

90.     Defendant was at all times fully aware of its obligation to protect the PII and PHI of its patients and employees. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### *Defendant Fails to Comply with Industry Standards.*

91.     As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

92.     Several best practices have been identified that a minimum should be implemented by healthcare providers like Defendant, including but not limited to: educating all employees; utilizing strong passwords; creating multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data, and; limiting which employees can access sensitive data.

93.     Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

94.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

95.     These frameworks are existing and applicable industry standards in the healthcare industry, yet Defendant failed to comply with these accepted standards, thereby opening the door to and failing to thwart the Data Breach.

***Defendant's Conduct Violates HIPAA.***

22

96.    HIPAA requires covered entities such as Defendant to protect against reasonably anticipated threats to the security of sensitive patient health information (PHI).

97.    Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

98.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA.  These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

99.    A Data Breach such as the one Defendant experienced, is considered a breach under the HIPAA rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, "...the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. 164.40.

100.    Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate it failed to comply with safeguards mandated by HIPAA regulations.

### *Defendant has Breached its Obligations to Plaintiffs and Class.*

101.    Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its patients' data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect patients' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to ensure that vendors with access to Defendant's protected health data employed reasonable security procedures;

e. Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

f. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

g. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

h. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

i. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

j. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding

individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

k.  Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

l.  Failing to train all members of Defendant's workforce effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of their workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b); and/or

m.  Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR 164.304 definition of encryption).

102.  As the result of maintaining its computer systems in manner that required security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information.

103.  Accordingly, as outlined below, Plaintiffs and Class Members now face an increased risk of fraud and identity theft.

*Data Breaches Put Consumers at an Increased Risk*
*Of Fraud and Identify Theft.*

104.     Data Breaches such as the one experienced by Plaintiffs and the Class are especially problematic because of the disruption they cause to the overall daily lives of victims affected by the attack.

105.     In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach.[33] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. *See* GAO chart of consumer recommendations, reproduced and attached as Exhibit B.  It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiffs and Class) must take after a breach like Defendant's are both time consuming and of only limited and short-term effectiveness.

106.     The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record," discussing the same in a 2007 report as well ("2007 GAO Report"). [34]

107.     The FTC, like the GAO (*see* Exhibit B), recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[35]

---

[33] https://www.gao.gov/assets/gao-19-230.pdf (last accessed December 13, 2023). *See* attached as Ex. B.
[34] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last accessed December 13, 2023) ("2007 GAO Report").
[35] *See* https://www.identitytheft.gov/Steps (last accessed December 13, 2023).

108.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

109.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

110.    Theft of Private Information is also gravely serious. PII/PHI is a valuable property right.[36]

111.    It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* 2007 GAO Report, at p. 29.

112.    Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

113.    There is a strong probability that the entirety of the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiffs and Class

---

[36] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

114.    As the HHS warns, "PHI can be exceptionally valuable when stolen and sold on a black market, as it often is. PHI, once acquired by an unauthorized individual, can be exploited via extortion, fraud, identity theft and data laundering. At least one study has identified the value of a PHI record at $1000 each."[37]

115.    Furthermore, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[38] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[39] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

116.    Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he

---

[37] https://www.hhs.gov/sites/default/files/cost-analysis-of-healthcare-sector-data-breaches.pdf at 2 (citations omitted) (last accessed December 13, 2023).
[38] *Identity Theft and Your Social Security Number*, Social Security Administration (last accessed December 13, 2023). (2018) at 1. Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed December 13, 2023).
[39] *Id.* at 4.

credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[40]

117.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[41]

118.    In recent years, the medical and financial services industries have experienced disproportionally higher numbers of data theft events than other industries. Defendant therefore knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## PLAINTIFFS' EXPERIENCES

### *The Jolla and Bracken Family*

119.    Plaintiff Latris Jolla is and at all times mentioned herein was an individual citizen residing in the State of Louisiana, in the Parish of East Baton Rouge. She is the parent of Carliyah Bracken, who has been treated at various times and undergone routine procedures at JKD. Each time she took her daughter to JKD, Plaintiff Jolla was required to provide JKD with both her own and her daughter's Private Information.

120.    Plaintiff Carliyah Bracken is and at all times mentioned herein was an individual citizen residing in the State of Louisiana, in the Parish of East Baton Rouge. Plaintiff Carliyah

---

[40] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last accessed December 13, 2023).

[41] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed December 13, 2023).

Bracken is an 18-year-old former patient treated at JKD. When she went to JKD as a minor, her mother and legal guardian, Latris Jolla was required to provide JKD with her Private Information.

121.    On or about September 13, 2023 the Jolla and Bracken Family received one (or possibly 2) Notice Letters, related to JKD's August 2023 Data Breach. See Exemplar Notice Letter, attached as Exhibit A.

122.    The Notice Letter received by the Jolla and Bracken Family was for the parent/or guardian of the child being treated at JKD who has now reached the age of majority.

123.    The Notice Letters that the Jolla and Bracken Family received listed an extensive amount of their PII and PHI that was in files which were involved in the Data Breach. Although the breached data varies from parent to child, JKD admitted that the copied or viewed data includes various combinations of: names, addresses, email, phone number(s), birth dates, Social Security numbers, driver's license numbers, health insurance policy information, treatment information including radiographic images, medical record numbers, account numbers, and health conditions. See Ex. A.

124.    Plaintiff Latris Jolla and her daughter are alarmed by the amount of their Private Information that was stolen or accessed. Plaintiff Jolla is even more alarmed by the fact that her daughter's Social Security number was identified as among the breached data on JKD's computer system. She recognizes her daughter may be a victim of fraud due to this Data Breach for years if not decades.

125.    Plaintiff Latris Jolla is also concerned about the effects of the data breach on herself. Each time she took her child to JKD, she was required to provide extensive Personal Information about herself to secure payment for their treatment. She received that her information had been

breached and has been receiving a significantly higher number of spam calls. Her telephone number was always used as the contact number for her child's medical care.

126.    Since realizing how extensive the JKD Data Breach was, the Jolla and Bracken Family has spent considerable time monitoring their bank accounts, as recommended by JKD in its Notice Letter. Additionally, Plaintiff Carliyah Bracken has been receiving multiple credit card offers in the mail since the Data Breach. She is alarmed that this may be in connection to the breach.

127.    The Jolla and Bracken Family is aware that cybercriminals often sell Private Information, and that the children's Private Information could be abused months or even years after a data breach.

128.    Had Plaintiff Jolla been aware that JKD's computer systems were not secure, she would not have entrusted JKD with so much of her and her daughter's Private Information.

***The Rhodes Family***

129.    Plaintiff Steven Rhodes is and at all times mentioned herein was an individual citizen residing in the State of Louisiana. Plaintiff Rhodes brings this matter on behalf of himself and his minor children, who were patients treated at JKD.

130.    When Plaintiff Rhodes' minor children became patients, Defendant required Plaintiff Rhodes to provide it with substantial amounts of his children's Private Information, including PHI.

131.    The Rhodes Family received multiple Notice Letters that each listed an extensive amount of the family members' PII and PHI that was in files impacted by the Data Breach. Although the breached data varies from parent to child, JKD admitted that the copied or viewed data includes various combinations of: names, addresses, email, phone number(s), birth dates,

Social Security numbers, driver's license numbers, health insurance policy information, treatment information including radiographic images, medical record numbers, account numbers, and health conditions.

132.    The Notice Letters did not offer Plaintiff Rhodes or his minor children any amount of credit monitoring services, but merely directed Plaintiff to nationwide credit reporting companies. This is not sufficient given that Plaintiff Rhodes' minor children will now experience a lifetime of increased risk of identity theft, including but not limited to, potential medical fraud.

133.    Plaintiff Rhodes and his minor children suffered actual injury in the form of time spent dealing with the Data Breach and monitoring their accounts for fraud, as well as an increased risk of fraud resulting from the Data Breach.

134.    Plaintiff Rhodes would not have provided his minor children's Private Information to Defendant had Defendant timely disclosed that its systems lacked adequate computer and data security practices to safeguard its patients' personal and health information from theft, and that those systems were subject to a data breach.

135.    Plaintiff Rhodes' minor children suffered actual injury in the form of having their PII and PHI compromised and/or stolen as a result of the Data Breach.

136.    Plaintiff Rhodes' minor children suffered actual injury in the form of damages to and diminution in the value of their personal and health information – a form of intangible property that Plaintiff Rhodes entrusted to Defendant for the purpose of receiving healthcare services from Defendant and which was compromised in, and as a result of, the Data Breach.

137.    Plaintiff Rhodes' minor children suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by their Private Information being placed in the hands of cybercriminals.

32

138. Plaintiff Rhodes and his minor children have a continuing interest in ensuring that their PII and PHI, which remain in the possession of Defendant, are protected and safeguarded from future breaches.

139. As a result of the Data Breach, Plaintiff Rhodes made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial and insurance accounts for any indications of actual or attempted identity theft or fraud, and researching credit monitoring options. Plaintiff Rhodes has spent several hours dealing with the Data Breach – valuable time he otherwise would have spent on other activities.

140. As a result of the Data Breach, Plaintiff Rhodes and his children have suffered anxiety as a result of the release of the PII and PHI in question, which they believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using Plaintiff Rhodes' minor children's PII and PHI for purposes of committing cyber and other crimes against them including, but not limited to, medical fraud and identity theft. Plaintiff Rhodes is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on his children's lives.

141. Plaintiff Rhodes' minor children also suffered actual injury from having their Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of their PII and PHI, a form of property that Defendant obtained from Plaintiff Rhodes; (b) violation of their privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud they now face.

142.    As a result of the Data Breach, Plaintiff Rhodes anticipates spending considerable time and money on an ongoing basis to try to mitigate and address these many harms caused by the Data Breach.

**The Franklin Family**

143.    Plaintiff Kaelyn Franklin is and at all times mentioned herein was an individual citizen residing in the State of Louisiana, in the Parish of East Baton Rouge. Plaintiff Franklin brings this matter on behalf of herself and her minor children who are or were patients treated at JKD. Plaintiff Kaelyn Franklin was required to provide JKD with her own and her children's Private Information.

144.    On or about September 13, 2023, the Franklin family received a Notice Letter related to JKD's August 2023 Data Breach. See Exemplar Notice Letter, attached as Exhibit A.

145.    This Notice Letter was sent to Plaintiff as the parent/or guardian of the children being treated at JKD.

146.    The Notice Letters that the Franklin family received listed an extensive amount of their PII and PHI that was in files which were involved in the Data Breach. Although the breached data varies from parent to child, JKD admitted that the copied or viewed data includes various combinations of: names, addresses, email, phone number(s), birth dates, Social Security numbers, driver's license numbers, health insurance policy information, treatment information including radiographic images, medical record numbers, account numbers, and health conditions.

147.    Plaintiff Kaelyn Franklin is alarmed by the amount of her own and her children's Private Information that was stolen or accessed. Plaintiff Kaelyn Franklin is even more alarmed by the fact that her children's Social Security numbers were identified as among the breached data

on JKD's computer system. She recognizes her children may be victims of fraud due to this Data Breach for years if not decades.

148.    Plaintiff Kaelyn Franklin is also concerned about the effects of the data breach on herself. Each time she took her children to JKD, she was required to provide extensive Personal Information about herself to secure payment for their treatment. She received that her information had been breached, and has been receiving a significantly higher number of spam texts and calls. Her telephone number was always used as the contact number for her children's dental care.

149.    Since realizing how extensive the JKD Data Breach was, Plaintiff Franklin has spent considerable time monitoring her bank accounts from fraudulent activity, as recommended by Defendant JKD. She spends about an hour a week trying to follow the recommendations of JKD.

150.    Plaintiff Franklin is aware that cybercriminals often sell Private Information, and that the children's Private Information could be abused months or even years after a data breach.

151.    Had Plaintiff Franklin been aware that JKD's computer systems were not secure, she would not have entrusted JKD with so much of her and her children's Private Information.

**PLAINTIFFS' AND CLASS MEMBERS' COMMON INJURIES**

208.    To date, Defendant JKD has done absolutely nothing to compensate Plaintiffs and Class Members for the damages they sustained in the Data Breach.

209.    Defendant JKD has not even offered one year of credit monitoring services while admitting that victims need to monitor for potential misuse of private information, a tacit admission that its failure to protect their Private Information has caused Plaintiffs and Class great injuries. *See* Ex. A. These limited services are inadequate when victims are likely to face many years of identity theft.

210.    JKD's offer fails to sufficiently compensate victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiffs' and Class Members' Private Information, out of pocket costs, and the time they are required to spend attempting to mitigate their injuries.

211.    Furthermore, Defendant JKD's credit monitoring offer and advice (*see* Ex. A) to Plaintiffs and Class Members squarely places the burden on Plaintiffs and Class Members, rather than on the Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach. Defendant merely sent instructions to Plaintiffs and Class Members about actions they can affirmatively take to protect themselves.

212.    Plaintiffs and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

213.    Plaintiffs' and Class Members' Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

214.    Plaintiffs and Class were damaged in that their Private Information is now in the hands of cyber criminals, sold and potentially for sale for years into the future.

215.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft.

216.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

217.     Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

218.     Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

219.     Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

220.     Plaintiffs and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

221.     Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

   a.  Finding fraudulent charges;

   b.  Canceling and reissuing credit and debit cards;

   c.  Purchasing credit monitoring and identity theft prevention;

   d.  Monitoring their medical records for fraudulent charges and data;

    e.   Addressing their inability to withdraw funds linked to compromised accounts;

    f.   Taking trips to banks and waiting in line to obtain funds held in limited accounts;

    g.   Placing "freezes" and "alerts" with credit reporting agencies;

    h.   Spending time on the phone with or at a financial institution to dispute fraudulent charges;

    i.   Contacting financial institutions and closing or modifying financial accounts;

    j.   Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

    k.   Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

    l.   Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

222.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information as well as health information is not accessible online and that access to such data is password-protected.

223.    Further, as a result of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details

about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

224.    Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of PII and PHI. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft.  Here, JKD knew of the breach since August 8, 2023, but did not notify the victims until September 13, 2023. Yet, JKD offered no explanation of purpose for the delay.

## CLASS ACTION ALLEGATIONS

225.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.

226.    Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> All persons whose Private Information was compromised as a result of the Data Breach discovered by Acadia Health, LLC d/b/a Just Kids Dental in August 2023 and to whom it provided notice in or about September 2023 (the "Class").

227.    Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

228.    Plaintiffs hereby reserve the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery. The proposed Class meets the criteria for certification under the Fed. R. Civ. P. Rule 23.

229.    <u>Numerosity</u>, Fed. R. Civ. P. 23(a)(1): The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number of Class Members is believed to be around **129, 623 individuals**.

230.    <u>Commonality</u>. As required by Fed. R. Civ. P. 23(a)(2) and (b)(3), there are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.    Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.    Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.    Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g.    Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h.      Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i.      Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.      Whether Defendant failed to provide notice of the Data Breach in a timely manner; and

k.      Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

231.    Typicality, Plaintiffs' claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class member, was compromised in the Data Breach. Fed. R. Civ. P. 23(a)(3).

232.    Adequacy of Representation, Fed. R. Civ. P. 23(a)(4):  Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

233.    Ascertainability:  The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case.

234.    Superiority, Fed. R. Civ. P. 23(b)(3):  A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of

separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

235.    Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

236.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    Whether Defendant failed to timely notify the public of the Data Breach;

b.    Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c.    Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.    Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

f.    Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach;

g.      Whether Defendant failed to abide by its responsibilities under HIPAA.

237.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CAUSES OF ACTION

### First Count
### Negligence
### (On Behalf of Plaintiffs and Class Members)

238.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

239.    Defendant JKD required Plaintiffs and Class Members to submit non-public personal information in order to obtain healthcare/medical services and/or employment.

240.    By collecting and storing this data in JKD's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft.  Defendant's duty included a responsibility to implement processes by which it could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a Data Breach.

241.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

242.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant JKD and its patients, which is recognized

by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach.

243.    JKD owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to it. JKD's duties included, but were not limited to, the following:

> a.    To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;
>
> b.    To protect patients' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;
>
> c.    To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;
>
> d.    To employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to HIPAA and the FTCA;
>
> e.    To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and
>
> f.    To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

244.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or

disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the healthcare, medical, and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

245.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

246.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

247.    Defendant breached its duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

    b.    Failing to adequately monitor the security of their networks and systems;

    c.    Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

    d.    Allowing unauthorized access to Class Members' Private Information;

    e.    Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

f.    Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

248.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

249.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

250.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

251.    Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiffs and Class Members in an unsafe and unsecure manner.

252.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

### Second Count
### Negligence *Per Se*
### (On Behalf of Plaintiffs and All Class Members)

253.    Plaintiffs re-allege the above allegations as if fully set forth herein.

254.    Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

255.    Pursuant to HIPAA, 42 U.S.C. § 1302d, et seq., Defendant had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

256.    Pursuant to HIPAA, Defendant had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." See definition of encryption at 45 C.F.R. § 164.304.

257.    Defendant breached its duties to Plaintiffs and Class Members under the Federal Trade Commission Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

258.    Defendant's failure to comply with applicable laws and regulations constitutes negligence per se.

259.    But for Defendant's wrongful and negligent breach of their duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

260.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that it failed to meet its duties, and that Defendant's breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

261.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## Third Count
### Breach of Implied Contract
### (On Behalf of Plaintiffs and Class Members)

262.    Plaintiffs re-allege the above allegations as if fully set forth herein.

263.    Plaintiffs and Class Members provided their Private Information to Defendant JKD in exchange for Defendant's medical services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

264.    Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

265.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

266.    Plaintiffs and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

267.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

268.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

269.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

270.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

271.    As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

272.    Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

273.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate long-term credit monitoring to all Class Members.

**Fourth Count**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and Class Members)**

274.    Plaintiffs re-allege the above allegations as if fully set forth herein.

275.    In light of the special relationship between Defendant JKD and Plaintiffs and Class Members, whereby Defendant became guardian of Plaintiffs' and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

276.    Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of its relationship with its current and former patients and employees to keep secure their Private Information.

277.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give detailed notice of the Data Breach to Plaintiffs and Class in a reasonable and practicable period of time.

278.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information.

279.    Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

280.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

281.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate

50

measures to protect the Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (vii) the diminished value of Defendant's services they received.

282.     As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

### Fifth Count
### Unjust Enrichment
### (On Behalf of Plaintiffs and Class Members)

283.     Plaintiffs re-allege the above allegations as if fully set forth herein. Plaintiffs bring this claim individually and on behalf of all Class Members. This count is plead in the alternative to the breach of contract count above.

284.     Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiffs and the Class Members.

285.     As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

286.     Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased goods and services from Defendant and/or its agents and in so doing provided Defendant with their Private Information. In exchange, Plaintiffs and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

287.    Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

288.    In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information.  Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

289.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

290.    Defendant failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members provided.

291.    Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

292.    If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

293.    Plaintiffs and Class Members have no adequate remedy at law.

294.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

295.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

296.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

**Fifth Count**
**Declaratory Judgment Act**
**(On Behalf of Plaintiffs and Class Members)**

297.     Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

298.     Under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulation described in this Complaint.

299.     JKD owes a duty of care to Plaintiffs and Class Members, which required it to adequately secure Plaintiffs' and Class Members' Private Information.

300.     JKD still possesses Private Information regarding Plaintiffs and Class Members.

301.     Plaintiffs allege that JKD's data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur in the future.

302.     Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

> a.     JKD owes a legal duty to secure its patients' Private Information and to timely notify customers of a data breach under the common law, HIPAA, and the FTCA;
>
> b.     JKD's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect patients' Private Information; and
>
> c.     JKD continues to breach this legal duty by failing to employ reasonable measures to secure patients' Private Information.

303.    This Court should also issue corresponding prospective injunctive relief requiring JKD to employ adequate security protocols consistent with legal and industry standards to protect patients' Private Information, including the following:

d.    Order JKD to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b.    Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, JKD must implement and maintain reasonable security measures, including, but not limited to:

i.    engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on JKD's systems on a periodic basis, and ordering JKD to promptly correct any problems or issues detected by such third-party security auditors;

ii.    engaging third-party security auditors and internal personnel to run automated security monitoring;

iii.    auditing, testing, and training its security personnel regarding any new or modified procedures;

iv.    segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of JKD's systems;

v.    conducting regular database scanning and security checks;

vi.   routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii.   meaningfully educating its patients about the threats they face with regard to the security of their Private Information, as well as the steps they should take to protect themselves.

304.   If an injunction is not issued, Plaintiffs will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at JKD. The risk of another such breach is real, immediate, and substantial. If another breach at JKD occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

305.   The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to JKD if an injunction is issued. Plaintiffs will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of JKD's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and JKD has a pre-existing legal obligation to employ such measures.

306.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at JKD, thus preventing future injury to Plaintiffs and other patients whose Private Information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

a)   For an Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Class;

56

b) For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

c) For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e) Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiffs and the Class;

f) For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

h) Pre- and post-judgment interest on any amounts awarded; and

i) Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: January 4, 2024                                  Respectfully submitted,

BY: */s/ Lisa A. White*
     Danielle L. Perry (admitted *pro hac vice*)
     Lisa A. White (admitted *pro hac vice*)
     **MASON LLP**
     5335 Wisconsin Avenue, NW, Suite 640
     Washington, DC 20015
     Tel: (202) 429-2290
     dperry@masonllp.com
     lwhite@masonllp.com

     **M. PALMER LAMBERT (#33228)**
     PENDLEY, BAUDIN & COFFIN
     1100 Poydras Street, Suite 2225
     New Orleans, Louisiana 70163-2225
     Tel: (504) 355-0086
     Fax: (504) 355-0089
     plambert@pbclawfirm.com

     Mason A. Barney (*pro hac vice* to be filed)
     Tyler J. Bean (*pro hac vice* to be filed)
     **SIRI & GLIMSTAD LLP**
     745 Fifth Avenue, Suite 500
     New York, New York 10151
     Tel: (212) 532-1091
     mbarney@sirillp.com
     tbean@sirillp.com

     *Attorneys for Plaintiffs*